UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

**GEORGE LEDESMA**,

CASE NO.  08cv0309-JTM(CAB)

Petitioner,

vs.

**ORDER GRANTING 28 U.S.C. § 2254 HABEAS PETITION**

**JOHN MARSHALL, WARDEN**,

Respondent.

George Ledesma ("Ledesma"), a state prisoner proceeding with the assistance of counsel, petitions this Court for a 28 U.S.C. § 2254 writ of habeas corpus.  Ledesma is serving an indeterminate sentence of seven years to life following his 1976 guilty plea for a murder he committed in the course of a grocery store robbery.  His federal Petition alleges his due process rights were violated by the Board of Parole Hearings' ("BPH") denial of parole at his November 2006 suitability hearing.  He seeks reversal of that decision and discharge from custody.  Respondent filed an Answer (Dkt Nos. 11, 12), and Ledesma filed a Traverse (Dkt No. 13).  By Order entered November 25, 2008, this matter was reassigned from the bench of the United States District Court for the Eastern District of California to visiting District Judge Jeffrey T. Miller, United States District Court for the Southern District of California.  (Dkt No. 25.)  After consideration of the parties' arguments, pertinent portions of the record, and controlling authority, for the reasons discussed below, the Petition is **<u>GRANTED</u>**.

1   **I.      BACKGROUND**

2           **A.      <u>Factual Background</u>**

3           The Court reiterates the factual background presented by the Orange County Superior Court

4   in its August 2007 decision to deny Ledesma state habeas corpus relief.  (Pet. Exh. K, Doc. 2-4, pp.

5   54-61.)[1]  This Court applies the statutory presumption of correctness to the undisputed portions of the

6   state court's factual findings.  28 U.S.C. § 2254(e)(1).

7                   On the evening of October 7, 1976, petitioner and two armed
                confederates entered a busy Albertsons grocery store in Anaheim
8                intending to rob the same.  Petitioner was personally armed with a
                double-barreled, sawed off shotgun.  The assailants emptied a number
9                of cash registers of their contents.  When an unarmed 20 year old store
                clerk was unable to open a safe as requested by petitioner, **petitioner**
10               **intentionally and fatally shot the victim in the stomach** at point
                blank range.  The assailants fled the store.

11
                Two days earlier, petitioner and his two confederates robbed a Ralphs
12               grocery store in Costa Mesa.  One of the victims was seriously injured
                when he was struck by one of the assailants with the barrel of a
13               shotgun.  **Petitioner's motive for the crimes was financial gain to**
                **support his drug habit**.
14
                The record also reveals petitioner sustained **multiple juvenile arrests**
15               **and/or adjudications** on charges of theft, possession of controlled
                substances, burglary, and robbery.  Petitioner did not dispute the
16               accuracy of his juvenile criminal record.

17  (Pet. Exh. K, Doc. 2-4, pp. 3-4 (emphasis added).)

18          The June 14, 1977 Abstract of Judgment and the June 13, 1977 change of plea and sentencing

19  hearing transcript reflect Ledesma pled guilty to one count of first-degree murder (CAL. PEN. CODE

20  § 187)  with personal use of a firearm (CAL. PEN. CODE § 12022.5) and one count of  first-degree

21  robbery (CAL. PEN. CODE § 211).  (Pet. Exh. B, Transcript pp. 3, 6; Pet. Exh. K, Doc. 2-4, p. 1.)  The

22  trial court found Ledesma "is not an habitual criminal" under either CAL. PEN. CODE §§ 644a or 644b.

23  (Pet. Exh. B, Abstract p. 2, # 11.)  He received "an aggregate sentence of 7 years-to-life with the

24  possibility of parole."  (Pet. P&A p. 3.)  His earliest parole eligibility date was in 1983.  (Pet. p. i)

25  _____

26          [1]  The voluminous Exhibits from both sides are only available as scanned documents.  The references
    to "Petition" are to the Points and Authorities rather than the printed form.  The references to "Exhibits" are
27  taken from the Table of Contents to that document, scanned as part of Document 1 in the Eastern District
    Docket, transferred March 3, 2008 from the Central District.  Many of the pages bear an imprinted number
28  from both the Central District case and the Eastern District case.

1  "By the time of his 2006 parole hearing, his *nineteenth*, Mr. Ledesma had served 16 years in excess

2  of the *maximum* aggregate prison term prescribed by the State's regulations for [the] commitment

3  offenses."  (Pet. p. i.)

4        **B.**      **<u>November 2, 2006 Parole Suitability Hearing</u>**

5            **1.**      **<u>Hearing Evidence</u>**

6      Presiding Commissioner Ed Martinez and Deputy Commissioner Diane Lushbough conducted

7  the November 2, 2006 parole suitability hearing pursuant to CAL. PEN. CODE §§ 3041, 3043, and the

8  Rules and Regulations of the Board of Prison Terms governing Parole Consideration Hearings for life

9  inmates.  After noting the panel had reviewed Ledesma's Central File ("C-File") and prior transcript,

10  Commissioner Martinez stated, "The purpose of today's hearing is once again, to consider the number

11  and the nature of the crimes that you were committed for, your prior criminal and your social history,

12  and your behavior and programming since your commitment . . . for the sole purpose of determining

13  your suitability for parole."  (Pet. Exh. A, pp. 5-6.)

14      Among other preliminaries, Ledesma confirmed:  he had never been included in any

15  psychological programs for mental illness problems; he was in the 10th grade when he dropped out

16  of school; while incarcerated, he had earned his GED, an Associate's degree, and needed just three

17  classes to complete his Bachelor's degree.  (Pet. Exh. A, pp. 3-5.)  Ledesma stipulated to the previous

18  record of his commitment offenses and prior criminality.  As was his right, he declined to discuss the

19  facts of the commitment offenses at the hearing because he had done so many times with the BPH,

20  counselors, and psychologists.  (Pet. Exh. A, p. 10-11.)  He was, however, "willing to talk about his

21  feelings about the crime, the feelings about the victim," and any other issues the panel might wish,

22  preferring to "focus on what he's been doing the last 30 years" while incarcerated. (Pet. Exh. A, pp.

23  10-11.)  The Presiding Commissioner overruled his counsel's anticipatory objection to the panel's

24  consideration of any "115" disciplinary items due to their remoteness in time (the most recent was

25  twelve years prior and all others were another ten years before), stating "all relevant, reliable

26  information shall be considered in determining suitability."  (Pet. Exh. A, pp. 9-10.)   The

27

28

Commissioner read into the record details of the crimes from the Investigating Officer's Report[2] and

Ledesma's September 2006 response thereto:

> "Ledesma states the account of the offense is accurate. However, he says the victim was unable to open the cash register and he never ordered the victim to open the safe. He admits he deliberately shot the victim. Ledesma understands what he did was wrong and his frustrations over things not going as planned got the best of him. Ledesma says he is not the same person and his whole philosophy of life has changed."

(Pet. Exh. A,16:10-19.)

Ledesma's criminal history was also read into the record:

> "No documented juvenile history, but does acknowledge the following juvenile arrest history in a Diagnostic Unit Evaluation dated March 15th of 1985. First arrest occurred when he was about 13 years old, no

---

[2] "The witness stated that on October 7th of 1976, 2238 hours at Albertson's Market, Anaheim, three suspects entered the market via the side north wall door with guns in their possession. Suspect number one, Ledesma, was in possession of a sawed off shotgun. Suspect number two, Cabrall (phonetic), was in possession of a chrome revolver, and suspect number three, Victor Ledesma, was also in possession of a handgun. Suspects shouted about statements such as, 'This is a robbery and everybody get down.' There were only three check stands open at the time, number two and number five. The victim was operating number six. Witness stated the suspects appeared nervous and possibly under the influence of something, that there was a lot of confusion and shouting by the suspects, especially suspect number one, who turned prior to leaving the market and shot the victim. Subsequently, the victim died. Witness at . . . checkout stand number two indicated suspect number three went to the register and emptied the contents into a shopping bag. The clerk at check stand number five stated that suspect number two approached her and demanded the money from her cash register. She did as requested. Suspect number two also demanded the customers' purses and wallets, but never collected them. Another witness stated he was in check out counter number six and the victim was checking his groceries. Suspect number one approached and ordered the victim to open up – open his till and then ordered the victim to open the safe. During this period, suspect number one was pointing . . . a double-barreled sawed off shotgun at the victim's face. Suspect number two then walked up and pointed a revolver at the victim. Suspect number one then grabbed the victim, pushed him, telling him to open the back vault. Victim told suspect number one he couldn't and suspect number one then grabbed the victim and pushed him again. Suspect number two was moving towards the north door and witness heard a shot fired. Suspect number one then ran towards the north door almost immediately after the shot was fired. All three suspects fled the store and entered a 1966 or 1970 – 67 Ford vehicle, which left the parking lot. On October 10th of 1976, officers responded to Westminster P.D. in reference to a suspect this [*sic*] robbery homicide that was in their custody. Suspect name was George Louis Ledesma. Ledesma related that he, Joseph Cabrall, Victor Ledesma, and the driver of the vehicle, Richard Andreson (phonetic) were involved in the robbery of Albertson's Market in Anaheim. . . . Ledesma stated he was carrying the double-barreled shotgun and stated the hammers were back on the shotgun, that his brother Victor . . . had a knife and did not have a revolver as witnesses stated and that Cabrall carried the silver finished revolver. Ledesma stated he poked the victim in the stomach with the shotgun to emphasize the fact that he wanted the registers opened and the shotgun discharged accidentally." (Pet. Exh. A, pp. 12-15.) The Commissioner also read into the record from the Investigating Officer's Report the facts of the earlier robbery to which Ledesma also pled guilty: "Three suspects entered Ralph's Market, Costa Mesa on 10/5 of 1976 during normal business hours, all armed with firearms and robbed market [*sic*] and customers leaving area on foot. Victim . . . was injured when struck by suspect number one with a shotgun barrel. . . .Cash money taken from the victim . . . amounted to 22 dollars. Victims were able to identify Ledesma and Cabrall as suspects." (Pet. Exh. A, pp. 15-16.)

> specifics given.  Ledesma also admitted to an arrest at age 14 for heroin
> . . . and burglary.  He said he went to juvenile hall for it.  Ledesma also
> said he committed two additional robberies, one at a gas station, and
> details were not provided on this."

(Pet. Exh A, p. 18.)

The Presiding Commissioner extracted a "**delinquency history**" from Ledesma's case summary:  "a '70 to '75 year bicycle theft, riding and abetting, a burglary, the possession of heroin, and a commitment to boys' ranch," with additional narcotics and drugs history recited to be "glue sniffing in 1972, barbiturates in 1971, claims at least one a week," and "'73, last habit 25 dollars a day."  (Pet. Exh. Q, pp. 18-19).  The Presiding Commissioner noted the record "[i]ndicates no adult convictions or arrests other than the commitment offense."  (Pet. Exh. A, 19:4-11.)  In the **personal history category**, the Presiding Commissioner read into the record:

> "Ledesma was born on September 23rd of 1957 to George and Neives
> Ledesma . . . [as] their second child.  Ledesma indicated his father was
> an alcoholic and he acted violently towards his wife and children.  He
> died in 1967 and Ledesma's mother married another man who became
> an alcoholic two years later.  When Ledesma was 15 years old his
> mother and stepfather divorced.  He began drinking alcohol at the age
> of 12 and by the time he was 15 he was experimenting with several
> drugs.  He quit school after the 10th grade and began to get in trouble
> with the law.  By [the] time he was 18 years old **Ledesma said he was
> spending approximately 150 dollars a day on heroin and
> committing crimes in order to support his habit**.  His younger
> brother Victor was also addicted to drugs at the time.  Ledesma worked
> off and on for his uncles who were construction workers.   While
> incarcerated, Ledesma has earned his high school diploma, AA degree,
> and is working toward his BS degree.  In 1995 he married Annette
> Ledesma.  According to him, approximately two and a half years ago
> his wife asked for a divorce" [and he indicated on the record that
> process had started].

(Pet. Exh. A, pp. 19-20 (emphasis added).)

His **social network** included two brothers and four sisters.  His brother "Victor Ledesma, 46, was his crime partner in the incident offense."  (Pet. Exh. A, p. 20.)  His brother Marcello Reyes, age 33, lived with their mother in Westminster, California, had visited Ledesma two years before the hearing, and wrote him letters.  His 49-year-old sister, Sally Ledesma, lived in Lakewood, California, wrote him letters and had visited him most recently five weeks before the hearing.  His sisters Gloria Ledesma, aged 47, and Rosalea Reyes, aged 35, maintained no contact with him. (Pet. Exh. A, pp. 20-21.)  When asked, Ledesma explained that Gloria had inherited their father's alcoholism, "has been

struggling with the bottle ever since I've been in prison," and was homeless, despite their mother's efforts to keep her home, but he had spoken to her about six months earlier when she told him she still thought of him and loved him. (Pet. Exh. A, pp. 26-27.) He described his half-sister Rosalea as "quite introverted," he had not seen her in about seven years, but when they spoke earlier that year, she was "enjoying life, just retired" from a nursing position with Orange County, and Ledesma stated, "I'm waiting to get out there and enjoy life with her." (Pet. Exh. A, pp. 27-28.) His sister Becky Menendez, age 44, lived in Garden Grove, California, had accompanied Sally on her most recent visit to see Ledesma, and also wrote Ledesma letters. His mother, aged 68, maintained "constant contact" and visited him in prison. (Pet. Exh. A, pp. 20-21.) Ledesma has no children.

In colloquy with the Presiding Commissioner, Ledesma described his childhood consistently with the psychological reports of record. He was "pretty happy" while his father was alive, but when his father came home drunk, he would fight with the mother and hit her and the children. Ledesma had difficulty dealing with the aftermath of his father's death. He described himself as angry and self-pitying. He had trouble accepting his mother's remarriage a year later, when he was about 11 years old. (Pet. Exh. A, p. 22.) His stepfather was an alcoholic. His mother divorced two years later.

> All I wanted to do was party and get high. It's not who I am and what I am today. I'm very big on education. You can see all everything [*sic*] I did academic and vocationally. If I would've been thinking about now back then, I would've zipped through school, got through a trade, and I wouldn't have done drugs.

(Pet. Exh. A, p. 23.)

The other participants in the commitment offenses "took a deal for two five to life's" for second degree murder. His brother served three years and ten days, had been working for the past 15 or 20 years, and owned a house in Anaheim. (Pet. Exh. A, p. 24-25.) With regard to his personal history, Ledesma added:

> Yes, I'd like to say that the same person that was thinking this, that was doing these things no longer sits in front of you. You have your guy going on 50 years old that really applied himself. You know – you was a messed up character when you were growing up. You've got to resolve and fix a lot of things in your life that wasn't doing right. Mainly dealing like drug abuse my drinking – not having any skills educational or vocationally. . . .[¶] I addressed them. Working on some things psychologically – anger. **I had to deal with my anger coping skills**. **That's basically why I killed a guy, which he didn't**

> **have it coming.  For that I feel extremely sorry that I was put in a position and grew up to – that I did that to another fellow human being.  And I take full responsibility.  I shook nothing and I take full responsibility for everything I did, for criminal history past, but this guy that did these things is not the same person that sits in front of you** . . . .

(Pet. Exh. A, pp. 25-26 (emphasis added).)

Turning to **"post-conviction factors,"** the Deputy Commissioner, who had also sat on Ledesma's 2001 BPH panel, noted his last full hearing had been January 6, 2004, at which time he had been denied parole for one year.  Ledesma had asked for a postponement of the 2005 hearing to July 28, 2005 to obtain a new psychological report.  (Pet. Exh. A, p. 28.)  The Deputy Commissioner summarized:

> You came into prison [in June 1977] with 108 points.  You got down to zero by 1991 and you've been at the mandatory placement score of 19 since that time. . . . [¶]  **Your 115's, you do have ten** and none during this period of review, which begins January the 6th 2004 . . . . In fact, **you've been free of them for about 12 years**. . . .[¶]  **And the most recent one was May 6, 1984.  So that's been some time ago. You have 13 counseling Chrono's, 128-A's** [*i.e.*, rules violation or behavior reports]**.  You've been free of those about ten years now. Your last one was July 30th, 1996**.

(Pet. Exh. A, pp. 28-29 (emphasis added).)

None of Ledesma's disciplinary infractions involved violence or assaultive conduct.  The only material changes to his record since the 2004 hearing included more educational progress, new support letters, and the new psychological report.  The Deputy Commissioner confirmed that in addition to Ledesma's progress toward his Bachelor's degree, he had renewed his "radiologist license" through 2007, having first taken the state licensing examination in 1994 or 1995.  He had used that skill as "an X-ray tech working in the Department of Corrections from about '95 to 2002."  Although he "loved that work," he was asked to leave the job because, he was told, he had been there too long, and "working too familiar with any one free staff could pose a security risk."  (Pet. Exh. A, pp. 29-31.) His other vocational accomplishments included:  completion of meat cutting in 1980; air conditioning and refrigeration in 1997; sewing machine operator "in PIA at CMC"; on the "Permanent Critical Worker List as a (inaudible) mechanic," as a repairer of sewing machines, having gone "through a sewing machine repair class right after I was asked to leave as an X-ray tech" for two years, obtaining

1   certification; and on the waiting list for the Furniture Factory, with a goal of "keeping busy and

2   working." (Pet. Exh. A, p. 31.)  His work reports were "very good." (Id.)  The Deputy Commissioner

3   observed:  "I saw . . . many chrono's that said you were on their Permanent Critical Worker List and

4   I understand that you've prepared well to do this in all aspects of the mechanical part." (Pet. Exh. A

5   34:2-6.)   Ledesma produced a chrono from the Fabric Products Superintendent praising his past

6   performance and requesting his transfer to CMC West "to resume using his training as a sewing

7   machine mechanic":

8         "Ledesma developed into an excellent mechanic before transferring to
          Avenal State Prison. . . . Inmate Ledesma's skill and knowledge would
9         be greatly beneficial to the continuing operation of this factory . . . ."

10  (Pet. Exh. A, p. 33.)

11       Addressing the **"self-help" and programming factors**, the Deputy Commissioner noted

12  Ledesma "had an ongoing and a fairly lengthy participation in NA back at least to '99, maybe before

13  that," and he "had been a moderator for Yokefellows Peer Counseling" for over 20 years while at

14  CMC.  (Pet. Exh. A, pp. 35-36.)  In addition to the considerable mathematics associated with his

15  radiology training and license renewals through correspondence classes, in 2005 he had taken "a

16  correctional learning network class" in math and geometry which he "loved", using pamphlets and

17  worksheets inmates complete independently.  (Pet. Exh. A, pp. 36-37.)  Ledesma added that he had

18  recently completed the first two of five segments of a life skills class, and would like to do more but

19  "the options are very limited" at his prison.  (Pet. Exh. A, pp. 37-38.)

20       The  panel  acknowledged  Ledesma's  most  recent  **Psychological  Evaluation**  dated

21  May 19, 2006 prepared by Corinne Schroeder, Ph.D., a "Board Certified Forensic."  **That report**

22  **noted polysubstance dependence "in full remission" (Axis I), and antisocial personality disorder**

23  **"resolved" (Axis II).**  (Pet. Exh. A, p. 38 (emphasis added).)  Although she left the global assessment

24  function ("GAF") score blank, the psychologist stated her professional opinions:

25        "**Mr. Ledesma has not been violent during the almost 30 years of
          his incarceration.  His risk of harm to others is *below average* for
26        parolee population and *equal to the average citizen* if he continues
          to remain clean and sober.  He is confident he can do so.  *His
27        remorse is sincere.  He will suffer self-recrimination for the rest of
          his life.*  He is confident in his ability to add to and sustain his gains
28        in and out of prison.**"

(Pet. Exh. A, p. 39 (emphasis added).)  Ledesma's counsel read additional portions of the report into the record, substantiating Ledesma's expressions of remorse, insight into his crimes and his adolescent self, and his focus on augmenting his progress in and out of prison.  (Pet. Exh. A, pp. 39-40.)

The Presiding Commissioner reviewed Ledesma's **parole plans**.  He intended to live in a spare room at his mother's three-bedroom Westminster home.  His brother who also lived there maintained self-sufficient employment renovating office complexes.  His secondary plan was to live in Irvine with a woman friend who had purchased a house for that purpose.  She and Ledesma planned to marry after his divorce became final.  She worked in home mortgages and refinancing, had one adult daughter, did not drink or use drugs, and had no trouble with the law.  (Pet. Exh. A, pp. 40-42.)

Numerous letters reviewed on record demonstrated a high level of personal support and significant family outreach efforts to provide options for Ledesma upon his release.  Recent letters from his cousin, Augustine Ledesma, and his 35-year-old nephew, Sam Calderon, stated family members would help him get a job and expressed: "My family and I are willing to assist him in any way possible."  (Pet. Exh. A, pp. 43-44.)  Sandra Rodriguez, a cousin in Garden Grove, wrote:

> "George has a lot of family and friends who are willing to help and support him in his life.  My husband and I own our own business and would be willing to get him trained in the dog business – dog grooming."

(Pet. Exh. A, p. 44.)

Ledesma's sister Sally Ledesma stated she would be able to help him with anything he needed.  His aunt Catalina Galindo stated she was "willing to assist him financially until he gets employment."  Vera Ledesma emphasized they "would all be there for him and support him."  Guadalupe Gomez offered him a home and assistance in finding a stable job.  His sister Rebecca Menendez promised to "help him financially and drive him around job hunting and to AA meetings," and offered to have him stay in her home with her husband and two children.  Veronica Felix, a cousin, expressed certainty he would be taken care of by his family to "show him [how] to get back on his feet and help him through life."  His aunt Alegandra Ledesma wrote, "From this point he can find a job in his expertise and can complete his bachelor's degree," noting he "also already has a place to stay with his mother, Neives Ledesma."  His sister Gloria Ledesma offered to "help him in any way possible for his release,

financially, emotionally, anything in my power," expressing her love for him and emphasizing he would have "100 percent family support" upon his release.  His sister Rosalea Reyes stated she owned her own home in Orange County and "would be willing and able to assist my brother when he gets out."  Sophia Rodriguez, his 32-year-old niece and goddaughter, offered her home and financial support.  Petra Guitan, his aunt and godmother, also offered financial and housing support until "he gets back on his feet and finds a job."  His mother wrote volunteering the same.  A nephew, Vincent, indicated he knew Ledesma "to be loving and caring and a good brother and person," again with promises of a place to live and help finding a job.  Lydia Andino, his nephew's fiancé, offered a home and help finding a job, although Ledesma did not personally know her.  (Pet. Exh. A, pp. 45-52.)  His brother Victor Ledesma wrote in a May 25, 2006 letter:  "I'm a homeowner and George is welcome to parole to my home if needed.  I am willing to help him financially, emotionally, and spiritually to make his transition into society successfully."  (Id. pp. 51-52.)   Two other cousins and two other aunts also provided letters of support.  A pen-pal friend of four years, Marilyn Moreno, a fellow inmate's sister, wrote in support of his release.  (Id. pp. 54-55.)

A family friend, Paul M., wrote offering to sponsor Ledesma in AA or NA:  "I've been with NA program for many years.  Able to sponsor George Ledesma upon release.  Take him to meetings, sponsor him, offer support in this program."  (Pet. Exh. A, pp. 55-56.)  Teresa Menendez wrote to say she had been a member of both AA and NA for 25 years, sponsors several people, and offered "to help assist George Ledesma when he is released to participate in one of the 12-step programs," to "introduce him to other men in the fellowship."  (Id. p. 59.)  Robert Salicedo also pledged to sponsor him, take him to AA meetings, and assist with all program steps.  (Id. p. 60.)  The record continues:

> Concerning employment, it indicates that you plan on getting employment as soon as possible and he [sic] still plans to seek employment as an exterminator, construction worker, a landscaper, and most recently you qualified in maintaining your certification on the X-ray technician.

(Pet. Exh. A, p. 43.)

Ledesma had several specific offers of employment.  Among others, his niece Rachel Nunez offered him a job at Nunez Roofing.  Joy Rodriguez offered him a job at Tri-Star Lending.  Robert M. Salicedo offered him a job at Excalimite Exterminating.  His nephew's fiancé's sister, Michelle

1   Andino, offered him a position assisting her in loan processing.  (Pet. Exh. A, pp. 53-54.)  Family

2   friend Carlos Guzman, a service and auto tech manager with American Auto Tow and Auto Repo,

3   wrote to say:  "Willing to employ George Ledesma upon his release."  (Id. p. 56, *see also* pp.60-65.)

4        Ledesma's counsel asked him to identify for the panel three priorities upon his release.

5   **Well, number one is I have great remorse for what I did.  So, sorry**
**that I was the one that killed Jack.  He didn't have it coming.  I was**
6   **a messed up, angry individual which has since took a good look at**
**his life, seen a lot of things wanting, worked on a lot of things,**
7   **rectified a lot of things, and made my life commitment to live a**
**clean life, sober life do the right thing in life because I didn't when**
8   **I was younger before Jack.**  [G]o out and support my family, be a
good [] son, be a good friend, be a good . . . husband again.  And to
9   continue on in with AA/NA, continue on availing myself to any
educational/vocational programs that I find out there.  There's some
10  things I want to do like diagnostic imaging.  I want to learn ultrasound,
want to go back and get my three classes for my Bachelor's and maybe
11  start working on my masters.  [W]ork as an X-ray tech.

12  (Pet. Exh. A, pp. 66-67 (emphasis added).)

13       The panel had no "3042 responses" opposing Ledesma's release other than from the Orange

14  County District Attorney.  In a closing statement, the Deputy District Attorney ("DA") referred the

15  panel to "copies of the autopsy photos" he had submitted.  He noted "the victim's remaining family,

16  his father, had [] **in the past** submitted letters also opposing release."  (Pet. Exh. A, pp. 65, 67

17  (emphasis added).)  Ledesma's counsel objected because "we don't know if that's still their opinion

18  at this time" and noting no such letters were identified or provided.  (Id. p. 68.)  The Presiding

19  Commissioner overruled the objection, stating he would "allow it" if it was "previously entered."  (Id.)

20  Ledesma acknowledged:  "There was one letter before, but I haven't seen it in a few years."  (Id.)  The

21  DA ultimately concluded, "Mr. Brown previously submitted a transcript **back in 1998** along with it,

22  the tape of the interview with the victim's father indicating his feelings."  (Pet. Exh. A, pp. 69-70

23  (emphasis added).)

24       In a lengthy argument, the DA acknowledged Ledesma had done "a lot of things that were quite

25  appropriate" and important while in prison, but emphasized, "the overwhelmingly significant factor

26  here is the seriousness of the crime itself."  (Pet. Exh. A, p. 70.)  He pointed to the immutable

27  circumstances of the crime as "most important factor," characterizing "the actions of the defendant"

28  as "particularly callous and absolutely pointless as they've come out."  (Pet. Exh. A, pp. 70-71.)  The

DA stated he was "not convinced" by Ledesma's expressions of remorse and responsibility, expressing

doubt "the [supportive] Psychological Reports [are] strictly accurate." (Id. p. 71.) He represented "for

an extended period of time, for the first ten years at least [of the 30] that he's been in prison, that he

denied that this act was even intentional" and found "bizarre" Ledesma supposedly "still doesn't step

forward and just admit what the heck happened here." (Id. pp. 71-72.) In challenging the sincerity of

Ledesma's remorse, the veracity of his testimony, and the impact of any rehabilitation, the DA argued:

> And I think also . . . , separating out **the earlier robberies and this robbery**, and actually, **I think that's a very, very significant fact here in determining the seriousness and the extent to which the defendant is rehabilitated and whether he's really taken responsibility for this**. Clearly, the defendant has learned the nomenclature and he has learned the words. I mean, he talks about pity party, the anger coping skills took out my suppressed anger. He's learned the language and can give it back to us. **But that really doesn't fully address his actions and really minimizes his actions in a lot of ways**. Executing somebody at point blank range is more than you know, a pity party or taking out suppressed anger or suppressed rage. It is much [*sic*] more significant act than that. And that's why I said I think it's very important to note that two days before this that the defendant was involved in a robbery.

(Pet. Exh. A, p. 72 (emphasis added).)

The DA dismissed the contrary professional opinions of Dr. Schroeder in her 2006

Psychological Report by questioning Ledesma's insight into his youthful anger and substance abuse

and criticizing his documented progress in resolving those issues. Relying solely on the circumstances

of the commitment offenses, the DA cast Ledesma's explanation of how and why the crimes occurred

as "not taking responsibility." Relating his own opinions, the DA argued:

> That really, really doesn't cover what his actions were because we have a chain of events leading up to this chain of robberies that the defendant has admitted to leading up to this. And then we have this particular [30-year-old] event and one thing that also basically is not really addressed when I read these reports is the fact that the shotgun was there and the shotgun was there in his hands, that he walked into a store with a sawed-off shotgun that was loaded. . . . It is a particular act to take a sawed-off shotgun, which is unlike – well, guns are – are killing weapons, but in particular, sawed-off shotgun is a man-killing weapon. It's the only reason to have them, that you have to form the intent to be willing to kill another human being to walk into the store with a loaded shotgun. **And so this wasn't an act of suppressed anger because the safe wouldn't open. This wasn't somebody acting out anger at their mother.** This was somebody who armed himself repeatedly and had to go to the trouble of getting the weapon and going in there and killing someone. **So for the defendant to tell us today, well I – and**

1                     **just pretty much (inaudible), that I – I'm acting out suppressed**
                    **anger, that really isn't taking full responsibility for it.  He still**
2                     **refuses to fully admit what he did here**.

3 (Pet. Exh. A, pp. 73-74 (emphasis added).)

4       The DA expressed personal "disappointment" at the mental health experts' assessments of

5 Ledesma's progress, suggesting he had duped Dr. Schroeder and prior evaluators, thereby rendering

6 their professional evaluations "not helpful at all" to a determination of his present parole suitability:

7                     I've read all the Psychological Evaluations here and this report, by Ms.
                    Schroeder in particular is pretty disappointing in the respect that it –
8                     and I don't say this, once again to be disrespectful to Mr. Ledesma, but
                    it appears that **she's just channeling him**, that I'm not real impressed
9                     with the report.  I mean she repeats – she quotes a – bunch of
                    statements from the defendant and her conclusions are basically the
10                     statements of the defendant taken **from the 2004 report**:  "Mr.
                    Ledesma's not the same person he was during the period of his life
11                     surrounding the crime," . . . and I don't find that particularly well done
                    or helpful at all with respect to evaluating . . . the defendant's
12                     dangerousness.

13 (Pet. Exh. A, p. 74 (emphasis added).)

14       Finally, in a rhetorical patchwork of nearly unintelligible pseudopsychology, the DA

15 questioned the sincerity of Ledesma's statement he is "a different person now" by suggesting, in effect,

16 that merely asking to be released is evidence Ledesma is not ready for that outcome:

17                     [S]o in weighing the risk to society, I think that we have to look at the
                    full range of seriousness of actions the defendant has taken and what
18                     remains his unwillingness to fully address what he did.  And it really is
                    a final point.  Again, I say this not to be flip or once again, disrespectful
19                     of Mr. Ledesma **and I recognize that this is a Catch-22**, but I find it
                    really interesting probably all of us have had experience with people
20                     who've gone through 12-step programs acknowledge a 12-step
                    programs [*sic*], NA, AA, and what is involved in those.  And what I []
21                     find interesting is, and a little bit troubling, is that people who go
                    through the – those types of programs and actually get it, just fully
22                     understand it, and I've seen people who I just really believe get it and
                    understand it, they look at their actions.  They look at the effects of
23                     alcohol.  They look at the way they have affected other people and of
                    course, one of the steps is to make amends for that.  **And I recognize**
24                     **this is a Catch-22** . . . **but really, I'm not convinced that somebody**
                    **who really gets that**, who fully understands the weight of what they
25                     did in taking another life and the weight of what they have done and
                    what that is on somebody on his family's life, on the father of the
26                     victim . . . . that the person **would sitting here asking to be released**,
                    that as we look at the **weight of what they did and the risk if they**
27                     **ever  involved** [*sic*] in narcotics or alcohol or any drugs.  You know --
                    that's – and **it is contradictory, but if you really understand it and**
28                     **you've really gone through that and you really understand the 12**

                                  

**steps, then you'd be sitting here saying you know what, anything you do is fair**. . . . And it also concerns me . . . that the defendant here today, the defendant in 2004, and the defendant Ms. Schroeder says **I'm not the same person I was during the period surrounding the crime. Somebody who has gone through the 12 steps I don't think makes that statement**. **That statement just scares the heck out of me** that they – that he seems to think that there's some dichotomy between that time and today. There isn't. . . . It's not a different person. It's a process. And so I would submit that the defendant still has some issues that he needs to work out here, that he needs to continue to go through the process. But I understand he has been working towards that, but **I don't think** he's done with the process.

(Pet. Exh. A, pp. 74-76 (emphasis added).)

Ledesma's counsel challenged the DA's "pure speculation" about Ledesma's unpreparedness for safe release on parole. "[T]he most recent Psych Report may not meet the People's standards, but it's done by somebody who has got a license in psychiatry . . . who has also reviewed my client and his entire C-File," adding "[w]e have Psych reports from '06, '03, '02, '99, and '98 that say the same thing." (Pet. Exh. A, p. 77.) Of the institutional psychiatrists who had evaluated him, "all of them since '98 or before find that he does not pose an unreasonable risk and that he has remorse for his crime and has – is a different person." (Id.) Noting Ledesma was committed to prison at age 19, counsel highlighted Ledesma's confession to the crimes and guilty plea within days of the offenses, listed in the Probation Report as a mitigating factor. (Id. p. 78.) Emphasizing there is nothing he can ever do to mitigate the crime itself, counsel observed Ledesma had not committed a violent act during his entire 30-year incarceration. Counsel further argued: "It was not a planned murder in that it happened in the heat of the moment," at a time Ledesma admits he was angry and addicted to drugs; the motive of the crime was robbery for drug money; he had no previous record of violence; he suffers from no "severe mental issues," and "[a]ll of his Psych Reports are great." ((Id. pp. 78-79.) With respect to the social history factor, counsel challenged:

. . . I would ask that the Board think about he was only an adult for one year when this happened and he came from – you know – he hails from a very terrible background, which he's gotten in touch with and I would ask that the Board give more credence to that. He was not in charge of his unstable social history. It's like it landed on him. I noticed that prior Panels were holding that against him when it's really no fault of his own that he was in that household.

(Pet. Exh. A. pp. 79-80.)

1      Regarding Ledesma's programming, self-help, and remorse, counsel summarized:

> His institutional behavior is [*sic*] clearly obvious he's a different person. You know – at the time of the murder he's a drug addict. Now he's been in 12-step programs. He's done an incredible amount of self-help, which has been documented in previous hearings and here today. And this was today he talked about his signs of remorse. It's well documented and what I read in the Psych Reports as well. We do understand the motivation for the crime – and his age now. . . . He's just turned 49 years old and that would reduce the probability of recidivism.

(Pet. Exh. A, p. 80.)

On his plans for the future and parole support, counsel continued:

> I counted more than 30 letters that he received and I can appreciate that the – you know – the Board has to inquire what his relationship is, but I would like the Board to note that we don't usually see 30 letters and aside from that, most of these letters . . . were hand written. His family sat down and hand wrote. They didn't just sign something somebody typed . . . . and I think that's reflective of the new person that he is. . . . I just don't think it's a coincidence that this many people are so open to allowing him to come home, to helping him. I mean, he's got a tremendous amount of family support. He's got at least five job offers.

(Pet. Exh. A pp. 80-81.)

In Ledesma's address to the Board, he discussed the victim, his remorse at having taken a life and for the effect on the victim's family, his insights into why he "killed Jack for no reason at all, just because I was angry individual" and a "messed up kid," and his commitment to staying drug- and alcohol-free, acknowledging his need and intention to continue with 12-step programs after release. (Pet. pp. 82-83.) He acknowledged "doing all the wrong things" as a young person. He traced his educational and vocational work while in prison, relating it to a goal of "paying back what I did" if he is released and with his plans "to continue to keep on doing outside what I did inside, avail myself to programs," recognizing "it's just a start just a beginning." (Id. p. 83.) He identified several realistic career goals, then summarized: "I just want to say that [if] you take a chance on me on finding me suitable for parole and you will not be disappointed. I have a great network out there. I have a great system, which I've implemented in here." (Id. at pp. 83-84.) He described his coping skills for avoiding drugs by describing the recovery programs' 12 steps and what they mean, then emphasized:

> I've got this ingrained in me. I'm continuing to do it when I get out, go to AA, go[] to NA, talk to my sponsors. . . . **I had to work on my anger because ultimately, that's why I killed Jack. I had so much**

**anger that which [*sic*] I had suppressed and repressed, I didn't even know I was doing that until I went to years and years of therapy** . . . . ultimately I'd just store it up, bottle it up, and then displaced on the victim. I had to learn coping skills to deal with my anger . . . . And from what the psychs say anger is energy. . . . Think about it and use that in a positive, constructive way, and I've been doing that for the last 30 years, never had a problem in prison. . . . **I've went to numerous, numerous, numerous groups that the Board recommended and I went and I benefited and I learned. I applied myself.** . . . I examined myself and I worked on a lot of things that need to be worked on in my life and I'm going to continue to do that when I get out. . . . **I'm going to work hard to get out there because what I did with – what I did to Jack, what I [*sic*] killed Jack and he didn't have it coming and I owe that to him. I owe him my best, and not just him. I'm not minimizing Jack, not minimizing my fault. . . . I accept full responsibility for everything I did.** . . . **For all my criminal history, for all everything I've done, I want to get everything out in the open, pay my debt to society, and continue to move on.** And I think that I've made great steps and I'll continue to make great steps and strides when I get out. I've done 30 years in prison, which is almost double the time that I've seen other lifers with the same crime as myself, murder, robbery. . . . [L]ike I said, if you take a chance on me, I'm not going to let you down, I'm not going to let myself down, I'm not going to let my family down, I'm not going to let God down, and I'm not going to let Jack down. . . . Got a good network in place that are going to help me. . . make my transition back into society, and that's what I've been working all along. I've been doing exactly what the Board asked me to do. All the Commissioners saying you know what, you got to earn your way out, buddy. . . . [¶] . . . and **I've compiled with everything the Board recommended. They recommended that I do my time, I upgrade myself education/vocationally, and. . . stay clean. . . . And I've been doing that.** Hey, I was a knucklehead when I came in. You know – I was drinking. I was – you know – not caring, but then I wised up and then I started working and was like look at the change. Look at . . . what I've done. I've kept my nose clean and my last 115 was 12 years ago. In the last 22 years, the last 22 years I received one 115. We're talking about time. When I'd like to get out so much would I do – have I earned it? I would like to think that I have. I would like to think that me and my program has got it. And I'll keep working it, keep working at it now and when I get out. . . .

(Pet. Exh. A pp. 84-88 (emphasis added).)

## 2.   Hearing Result And Reasoning

Following a recess, the panel announced another one-year denial of parole based on its

formulaic conclusion Ledesma was still "not suitable for parole and would pose an unreasonable risk

of danger to society or threat to public safety if released from prison." (Pet. Exh. A p. 90.) First, the

Presiding Commissioner reviewed the factual detail of **the commitment offenses**, quoting the statutory

factor language "the offense was carried out in a manner which demonstrates an exceptionally

insensitive and [*sic*] disregard for human suffering." (Id. p. 90.)  "[T]he **motive for the crime was inexplicable** and very trivial in relation to this offense and again the terms of anger, I guess, the money situation greed, and **obviously to support a drug habit**." paradoxically supplying a motive to the allegedly "inexplicable" crime.  (Id. pp. 90-91 (emphasis added).)  "Again, these conclusions are drawn from the Statement of Facts wherein the prisoner on October 7th of 1976, along with his two other crime partners," robbed the grocery store, "and when the victim Jack Mason was not able to open up a certain safe due to the fact that he did not have a key **the prisoner *became impatient and angry and shot the victim in the abdomen*** causing his death." (Id. p. 91 (emphasis added).)  The Presiding Commissioner concluded, "The prisoner has a record of violence and assaultive behavior, an escalating pattern of criminal conduct and/or violence [up to age 19], **he's failed to profit from society's previous attempts to correct his criminality** [through] *juvenile* probation, *juvenile* camp, county jail." (Id. p. 91-92 (emphasis added).)

> By all accounts, he does come from **an unstable social history**, again, dropping out at the age of 16 years old from high school.  Substance abuse issues, the use of heroin and alcohol . . . at an early age.  By all . . .accounts a dysfunctional family setting.  In regards to his criminal history he has [juvenile] arrests for possession of heroin, burglary, robberies, and property offenses.

(Pet. Exh. A, p. 92 (emphasis added).)

Turning to Ledesma's "**misconduct while incarcerated**," the Presiding Commissioner counted "13 128 counseling chrono's, most recent July the 3rd of 1996, theft of state pants." (Pet. Exh. A, p. 92).  He counted ten "serious 115 disciplinary reports," with the most recent "May 6th of 1994 for possession of intoxicating glue."  (Id.)

Apparently persuaded by the DA's critical opinions of the forensic psychological assessments, **the panel dismissed the most recent Psychological Report in a single, unelaborated sentence:** "The Psychological Report dated May 19th of 2006 authored by Dr. Schroeder is supportive, but incomplete [in unspecified ways] again so with that we'll go into parole plans," and ordered a new Psychological Evaluation "for your next hearing in 2007." (Pet. Exh. A, pp. 92-93 (emphasis added).)  The commissioner admonished Ledesma to "[c]ooperate with . . . a clinician in the completion of a clinical evaluation" despite the lack of evidence Ledesma had ever failed to do so.  (Id., p. 93.)

> Again, in regards to **your arrangements for [parole] residence and employment, I think they are satisfactory and as far as marketable skills, you have all of those**. So in regards to – again the PC 3042 notices **the district Attorney of Orange County opposes your parole suitability**.  Also note that **the Deputy District Attorney from Orange County is present and also opposes the finding of parole suitability**.  Nevertheless, the prisoner should be commended for his vocational programs.  Again, in the – as a Radiology tech, meat cutting also marketable skills in the area of repair and maintenance for sewing machines education obtaining your GED your AA and as well as now continuing on to get your BS degree.  Also as well as your classification score to be zero and your participation in AA and NA again since 1999.  **However, these positive aspects of your behavior do not outweigh the factors of unsuitability**.

(Pet. Exh. A, pp. 92-93 (emphasis added).)

The panel had rejected out of hand the clinical evidence attesting to the genuineness and permanence of his remorse, his recovery from antisocial personality tendencies, and the low risk he would pose to public safety if released.  To this end, the Deputy Commissioner supported the panel's rejection of that evidence, instead focusing on an isolated and paraphrased statement Ledesma made in passing:

> DEPUTY COMMISSIONER LUSHBOUGH: . . . There was something you said and it really struck me and perhaps you didn't meant it the way it came out.  I'll share it with you only because it was just [*sic*] kind of caught my ear.  You said – **you were talking about remorse** and you said that you were really – you know – sorry because you were put in the position and did the crime and I have to tell you something.  **It came out sounding as if you were a – you felt you were a helpless pawn, that some unknown force had put you there**  You know and I know that you took yourself there for whatever reason – you know – and I guess that kind of caught my ear because I can appreciate the fact that you had a dysfunctional background, as your Counsel described.  She described it as abusive.  I can appreciate that, but that still doesn't place you where you were with that shotgun and if you didn't – and I didn't hold that against you, but it was just a communication thing and I wanted to just explore it with you and tell you that **it really kind of came off kind of like you felt that you weren't really at fault**.  And I know that can't be the case. . . .

> INMATE LEDESMA:  Not at all.

(Pet. Exh. A, pp. 95-96 (emphasis added); *cf.* Pet. Exh. A, 26:7-9 ("I take full responsibility for everything I did"); 87:25-26 ("What, do I deserve to get out? No, I don't deserve it.... I deserve to stay in prison the rest of my life, but the time frame, which the legislature had determined for my crime, I have already exceeded.").)

The Presiding Commissioner gave Ledesma generalized and cursory advice.  "The Panel recommends that the prisoner remain disciplinary free" as, this Court notes, he had been for more than ten years prior to the 2006 hearing.  (Pet. Exh. A, p. 93.)  "If available, continue your participation in self-help, especially in the AA/NA," programs Ledesma had actively pursued since at least 1999.  (Id.) "And again, more therapy programs along with [] the AA/NA."  (Id.)  "I know that you were involved in life skills, but I think that you need to direct yourself a little more in your self-help studies as well," an enigmatic observation considering the record of Ledesma's participation in virtually all available programs and his documented quest for more.  (Id.)  The Presiding Commissioner continued:

> A couple of things that I want you to note, Mr. Ledesma, is that **in regards to your remorse today the Panel does have some concerns** I think in some of your remarks that you have indicated as to when you were talking about the people that you've hurt and harmed.  I mainly heard about what you – yourself and your family, but **I really didn't hear anything regarding the family of the victim, Mr. Mason, or himself**.  The Panel agrees that **there was some arrogance about you today** and I don't know I sense that it's because – you know you've been here a number of times and maybe you come with **an attitude** that's at this point in time **you feel that now you do deserve a date and that you should get out and that you've done 30 years, as you had indicated.  And I want to clear this with you in the sense that is not the case, Mr. Ledesma**.  The case is that in – from 1978 to 1994 you me – we're [sic] messing up and in looking at it, again, more than half of those 29 years we're talking about we didn't – we look at this as you – that you started making a turn about 12 years ago.  But prior to that, you had numerous – **half of the ten 115's had to do with substance abuse, either possession of pruno or under the influence**.  Okay?  So do we look back at when you first entered this institution?  No, we look back at 19[94] . . . your last 115. . . . Okay?  So I think that's where you need to start, sir.  All right? And take a good look at that . . . .

(Pet Exh. A, pp. 93-94.)  The Court observes, from the entirety of the hearing record, the Presiding Commissioner's "arrogance" remarks appear to be directed at Ledesma's evident pride in his accomplishments and confidence in his ability to continue his self-improvement and to remain drug-free.

Commissioner Martinez concluded:

> . . . I don't – certainly do not take away anything from you from what you've done and what you've accomplished.  I place a lot of weight on that as far as your – what you've done for yourself in here and programmed because **you're an exception as far as inmates are concerned that come in here** because majority of them, all I get is excuses – you know – as to why they haven't been able to do this or

why they haven't been able to program.  Okay?  So you have made
these things happen for yourself and that is commendable.  All right?

(Pet. Exh. A, pp. 94-95 (emphasis added).)

The Deputy Commissioner added:

Well, I also want to agree that you've done a lot of very positive things
and I think you need to be commended for that and I certainly do
commend you for all the good things you've done.  I have to agree with
the Commissioner, however, more than half of that 29 years you were
really getting yourself in trouble and I'm sorry about that, but **I can see
that the last 12 you have begun to take a new path**.  That's great.
I'm glad.

(Pet. Exh. A, p. 95 (emphasis added).)

### C.      State Habeas Corpus Proceedings

Ledesma unsuccessfully sought habeas relief from the November 2006 parole denial in the

Orange County Superior Court.  He presented five grounds for relief:

1.      The Board of Parole Hearings' decision was **arbitrary and
devoid of any evidence relevant to petitioner's current suitability
for parole** in violation of petitioner's protected liberty interest in parole
and right to due process.

2.      The Board of Parole Hearings' repeated denial of parole based
solely on the unchanging circumstances of the commitment offenses
and social/criminal history has impermissibly transformed petitioner's
sentence to life imprisonment without the possibility of parole in
violation of petitioner's right to due process.

3.      The determination of petitioner's parole suitability under the
more onerous guidelines set forth by the Determinate Sentencing Law
rather than under the Indeterminate Sentencing Law guidelines in effect
at the time of the commitment offenses violates the constitutional
proscription against ex post facto legislation and petitioner's right to
due process.

4.      The "some evidence" standard of judicial review should not be
applied to review petitioner's constitutional claims.

5.      The inherent anti-parole bias by the Governor and the Board's
failure to comply with statutory composition requirements for the
Board violates petitioner's protected liberty interest in parole and right
to due process.

(Pet. Exh. K, pp. 2-3 (emphasis added).)

By Order entered August 15, 2007, the Superior Court enumerated the six BPH findings under

review as:

- 20 -

A. The **commitment offenses** targeted multiple victims for a very trivial motive and were carried out in an especially vicious and brutal manner.

B. Petitioner has a history of **prior criminality**.

C. Petitioner has an **unstable social history**.

D. Petitioner has a record of **institutional misconduct**.

E. Petitioner's most recent **psychological assessment** is supportive but incomplete.

F. **Opposition to parole was expressed by the Orange County District Attorney's Office**.

(Pet. Exh. K, p. 2 (emphasis added).)

The Superior Court applied the "some evidence" standard of judicial review as "established by the California Supreme Court on this issue," citing In re Rosenkrantz, 29 Cal.4th 616, 654 (2002). (Pet. Exh. K, p. 7.) "Courts may review the factual basis of a decision of the Board denying parole in order to ensure that the decision complies with due process of law," but "may only inquire whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation."[3] (Pet. Exh. K, p. 5, citing Rosenkrantz, 29 Cal.4th at 658.) The Superior Court found "**three of the six findings made by the Board lack adequate evidentiary support**," but found evidence for "the Board's conclusion that petitioner remains currently unsuitable for release on parole."[4] (Pet. Exh. K, pp. 3-5 (emphasis added).) "**The circumstances of the commitment offense and petitioner's criminal history alone reasonably justify the Board's lingering concern over petitioner's current suitability for release on parole**." (Pet. Exh. K, p. 4.) In particular, the court found evidence to support the Board's conclusion the "circumstances of the

---

[3] "The precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Board of Parole Hearings, but **the decision must reflect an individualized consideration of the specified criteria** and cannot be arbitrary or capricious. It is irrelevant that a court might determine that the evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. **As long as the decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the decision.**" (Pet. Exh. K, pp. 5-6 (emphasis added), citing Rosenkrantz, 29 Cal.4th at 677.)

[4] The court also rejected Ledesma's challenge under CAL. PEN. CODE § 5075 to the panel composition and its purported bias against him. (Pet. Exh. K, p. 8.) He does not pursue that claim here.

commitment offenses" were "especially vicious and brutal acts carried out with an exceptionally callous disregard for human suffering," and "petitioner has a history of prior criminality," citing PEN. CODE § 3041(b) and CAL. CODE REGS., tit. 15, § 2281(b) and (c)(1)(A)(B)(D)(E).  (Pet. Exh. K, p. 3.) The court observed Petitioner's juvenile record "reveals petitioner sustained multiple juvenile arrests and/or adjudications on charges of theft, possession of controlled substances, burglary, and robbery" (Pet. Exh. K, p. 4).  The court found those factors "reflect a level of cruel premeditation and a callous and persistent disregard for the safety and well being of others that cannot be ignored," concluding, "**[P]etitioner's documented inability to abide by the law consistently and his brutally violent and random victimization of innocent bystanders during the commitment offenses support the Board's conclusion that petitioner remains currently unsuitable for release on parole.**"  (Pet. Exh. K, pp. 4-5 (footnote omitted) (emphasis added).)

The court rejected Ledesma's argument the BPH "impermissibly continues to rely on the unchanging circumstances of his commitment offenses and criminal history to deny him parole in violation of his right to due process."  (Pet. Exh. K, p. 6.)  The court also dismissed Ledesma's due process and *ex post facto* challenges to the BPH's application of the Determinate Sentencing Law ("DSL").  The court discounted any constitutional concern over retrospective application of the DSL sentencing guidelines: "Standards employed under the former indeterminate sentencing law [("ISL")] for determining parole were not altered by the enactment of the" DSL.  (Pet. Exh. K, p. 7, citing *inter alia* Connor v. Estelle, 981 F.2d 1032, 1034-35 (9th Cir. 1992) ("We agree with the California courts that the application of the DSL parole-suitability guidelines to prisoners sentenced under the ISL does not disadvantage them, and therefore does not violate the federal constitutional prohibition against *ex post facto* laws") and In re Duarte, 143 Cal.App.3d 943, 950-51 (1983) ("there has been neither a change in philosophy, nor a change in the criteria used to reach" a parole suitability decision.).)

In denying the petition, the court concluded, "The record before the court reflects due consideration of petitioner's eligibility for parole and an adequate evidentiary foundation for the Board's decision," given the BPH's very broad discretion "to identify and weigh the factors relevant to predicting by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts" and the court's obligation to view "the record in the light most

favorable to that determination."  (Pet. Exh. K, p. 5, citing, *inter alia*, <u>In re Fuentes</u>, 135 Cal.App.4th 152, 160 (2005).)   The California Court of Appeal and the California Supreme Court summarily denied Ledesma's habeas petitions on October 4, 2007 and December 12, 2007, respectively.  (Pet. Exhs. L, M.)

### D.   <u>Federal Habeas Proceedings</u>

Ledesma's federal Petition was filed in the Central District of California on February 8, 2008. By Order entered February 26, 2008, the matter was transferred to the Eastern District.   On March 12, 2008, the court directed Respondent to respond to the Petition. On May 27, 2008, Respondent filed a Motion To Stay proceedings pending the issuance of the mandate in <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir.), *reh'g en banc granted*, 527 F.3d 797 (9th Cir. May 16, 2008).[5] Ledesma filed an opposition to a stay.  On June 5, 2008, the Eastern District court denied the motion, finding "ample binding precedent from the Ninth Circuit other than <u>Hayward</u> which bear [*sic*] on the issues in the petition," citing <u>Superintendent v. Hill</u>, 472 U.S. 445, 457 (1985), <u>Biggs v. Terhune</u>, 334 F.3d 910, 914 (9th Cir. 2003), <u>Sass v. California Bd. of Prison Terms</u>, 461 F.3d 1123, 1127-28 (9th Cir. 2006), and <u>Irons v. Carey</u>, 505 F.3d 846, 851 (9th Cir. 2007).  (Dkt No. 10, 2:19-24.)

Ledesma argues the denial of parole based on the facts of a 31-year-old murder offense and "other immutable 'facts'" violates his right to due process "because he has been determined forensically to pose a *low* parole risk, far below the 'unreasonable risk' codified standard," and the facts recited in support of denial no longer "bear any nexus to his current parole risk." (Pet. P&A p. 11 (typography altered).)  He has "indisputably" achieved "the maximum level of parole suitability," and because underlying offense facts can ever improve, "the process has converted his prison term to life without the possibility of parole and extinguished his protected liberty interest in parole."  (<u>Id.</u>) Addressing each BPH unsuitability finding *seriatim* (<u>Id.</u> pp. 13-40), he contends (A) no evidence

---

[5]   In <u>Hayward</u>, a three-judge panel found the petitioner's due process rights were violated by the governor's reversal of the BPH's finding he was suitable for parole, granting habeas relief on grounds the unchanging factors of the petitioner's criminal history, unstable social history, and commitment offense did not constitute even "some evidence" to support a conclusion he would pose a current danger to public safety if released. The Ninth Circuit has granted *en banc* review of issues which include: (1) whether prisoners have a constitutionally protected liberty interest in parole; and (2) if a liberty interest is created, what process is due under clearly established United States Supreme Court authority.

1   supports the notion he poses an "unreasonable risk of danger to society or a threat to public safety,"

2   and (B) the panel's findings "also flunk the *some evidence* test" (Id. pp. 11, 12).  He also reprises his

3   state law DSL versus ISL challenge as having "abrogated his rights under the due process and *ex post*

4   *facto* clauses of the federal and state constitutions."  (Pet. P&A p. 41 (typography altered).)

5   **II.     DISCUSSION**

6          **A.     Legal Standards**

7                 **1.     Federal Habeas Review**

8          A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person

9   in custody pursuant to the judgment of a State court only on the ground that he is in custody in

10  violation of the Constitution or laws or treaties of the United States." 28 U.S.C.A. § 2254(a).  Only

11  errors of federal law can support federal intervention in state court proceedings.  Oxborrow v.

12  Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989).  Federal habeas courts are bound by states'

13  interpretations of their own laws.  Himes v. Thompson, 336 F.3d 848, 852 (9th Cir. 2003); Estelle v.

14  McGuire, 502 U.S. 62, 68 (1991) (federal courts may not reexamine state court determinations on state

15  law issues).

16         Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and

17  Effective Death Penalty Act of 1996 ("AEDPA").  AEDPA establishes a "highly deferential standard

18  for evaluating state-court rulings," requiring "that state-court decisions be given the benefit of the

19  doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002).  Federal courts must presume the correctness

20  of a state court's factual determinations unless the petitioner "rebut[s] the presumption of correctness

21  by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  A federal court can grant a prisoner

22  habeas relief only if it determines the result of a claim adjudicated on the merits by a state court "was

23  contrary to, or involved an unreasonable application of clearly established Federal law, as determined

24  by the Supreme Court of the United States," or "was based on an unreasonable determination of the

25  facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see* Bell

26  v. Cone, 535 U.S. 685, 694 (2002); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (a state court's

27  adjudication on the merits "based on a factual determination will not be overturned on factual grounds

28  unless objectively unreasonable in light of the evidence presented in the state court proceeding").

1    Relevant Supreme Court precedent for the federal habeas analysis includes not only bright-line

2  rules but also the legal principles and standards flowing therefrom.  *See* Lockyer v. Andrade, 538 U.S.

3  63, 64-65, 76 (2003) ("clearly established federal law" refers to the governing legal principle or

4  principles set forth by the Supreme Court at the time the state court renders its decision"); Bradley v.

5  Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002), *citing* Williams v. Taylor, 529 U.S. 362, 407 (2000).

6  A state court's decision is "contrary to" clearly established federal law if it (1) applies a rule that

7  contradicts governing Supreme Court authority, or (2) it "confronts a set of facts . . . materially

8  indistinguishable from" a Supreme Court decision but reaches a different result.  Early v. Packer, 537

9  U.S. 3, 8 (2002).  To be found "unreasonable," the application of the precedent "must have been more

10 than incorrect or erroneous;" the application "must have been 'objectively unreasonable.'" Wiggins

11 v. Smith, 539 U.S. 510, 520-21 (2003) (citation omitted); *see also* Middleton v. McNeil, 541 U.S. 433,

12 436 (2004) (*per curiam*).

13   A petitioner may also be entitled to habeas relief if the state court's factual determination rests

14 on an unreasonable evidentiary foundation.  28 U.S.C. § 2254(d)(2); Gonzalez v. Pliler, 341 F.3d 897,

15 903 (9th Cir. 2003).  Alternatively, a state court's failure to consider and weigh highly probative

16 evidence central to the petitioner's claim may qualify as an unreasonable determination of the facts.

17 Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).

18        In making findings, **a judge must acknowledge significant portions
         of the record, particularly where they are inconsistent with the
19       judge's findings.** The process of explaining and reconciling seemingly
         inconsistent parts of the record lays bare the judicial thinking process,
20       enabling a reviewing court to judge the rationality of the fact-finder's
         reasoning. . . . **[F]ailure to take into account and reconcile key parts
21       of the record casts doubt on the process by which the finding was
         reached, and hence on the correctness of the finding**. *See, e.g.*, Gui
22       v. INS, 280 F.3d 1217, 1228 (9th Cir.2002) (failure of immigration
         judge to support adverse credibility finding **with specific, cogent
23       reasons** constitutes grounds for reversal); Winans v. Bowen, 853 F.2d
         643, 647 (9th Cir.1988) (failure of ALJ to give **specific reasons for
24       ignoring treating physician's opinion constitutes grounds for
         reversal**). . . .[¶] Failure to consider key aspects of the record is a defect
25       in the fact-finding process.  Miller-El. 537 U.S. at 346.

26 Taylor, 366 F.3d at 1007-08 (emphasis added) ("In passing section 2254(d)(2), Congress has reminded

27 us that we may no more uphold such a factual determination than we may set aside reasonable state-

28 court fact-finding"); *see* Miller-El, 537 U.S. at 340 ("A federal court can disagree with a state court's

1   credibility determination and, when guided by the AEDPA, conclude the decision was unreasonable

2   or that the factual premise was incorrect by clear and convincing evidence").

3       A federal habeas court applying those standards looks to the last reasoned state court decision.

4   Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); *see* Ylst v. Nunnemaker, 501 U.S. 797,

5   803 (1991) (when there is no reasoned decision from the state's highest court, the federal court "looks

6   through" to the rationale of the underlying decision). Only the Orange County Superior Court reached

7   the merits of Ledesma's federal claims in a reasoned decision. The denial of a petition by the state's

8   highest court "without comment or citation constitute[s] a decision on the merits of the federal claims,"

9   and "such claims [are] subject to review in federal habeas proceedings." Hunter v. Aispuro, 982 F.2d

10  344, 347-48 (9th Cir. 1992). Ledesma exhausted his state court remedies and timely presented his

11  claims to the federal court within AEDPA's one-year statute of limitations. 28 U.S.C. § 2244(d)(1).

12             **2.**    **Due Process In Parole Context**

13             **a.**    **California Prisoners Have A Liberty Interest In Parole**

14      The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of

15  life, liberty, or property without due process of law. The due process analysis proceeds in two steps.

16  The court first determines whether the state has interfered with a prisoner's constitutionally-protected

17  interest. If so, the court then determines whether the procedures accompanying the interference were

18  constitutionally sufficient. *See* Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460

19  (1989); Board of Pardons v. Allen, 482 U.S. 369, 377-78 (1987); *see also* Sass, 461 F.3d at 1127;

20  Biggs, 334 F.3d at 913, *citing, inter alia,* McQuillion v. Duncan ("McQuillion I"), 306 F.3d 895, 900,

21  903 (9th Cir. 2002).

22      It is well established there is "no constitutional or inherent right of a convicted person to be

23  conditionally released before the expiration of a valid sentence," but a state can "create a liberty

24  interest protected by the due process guarantees" when its parole scheme employs "statutory language

25  [that] itself creates a protectible expectation of parole." Greenholtz v. Inmates of Nebraska Penal &

26  Corr. Complex, 442 U.S. 1, 11-12 (1979) (finding the Nebraska parole statute providing the Board

27  "shall" release prisoners, subject to certain restrictions, creates a due process liberty interest in release

28  on parole); *see also* Allen, 482 U.S. 369 (finding the same with respect to the Montana parole statute);

Thompson, 490 U.S. at 463 ("the use of 'explicitly mandatory language,' in connection with the establishment of 'specified substantive predicates' to limit discretion, forces a conclusion that the State has created a liberty interest") (citations omitted).

In California, "prior to [an] inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate **and shall normally set a parole release date.**" CAL. PEN. CODE § 3041(a)(emphasis added). "The panel or board . . . **shall set a release date unless** it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that **consideration of the public safety requires a more lengthy period of incarceration for this individual**, and that a parole date, therefore, cannot be fixed at this meeting." CAL. PEN CODE § 3041(b) (emphasis added). That language creates a presumption that parole release will be granted unless public safety concerns are supported by reliable evidence. McQuillion I, 306 F.3d at 901-02 (recognizing a California state prisoner serving a life sentence has a cognizable liberty interest in release on parole, based on the court's determination California's parole scheme closely resembles those interpreted in Greenholtz and Allen). The Ninth Circuit has repeatedly held California's parole statute gives rise to a constitutionally protected liberty interest in a parole release date protected by the procedural safeguards of the Due Process Clause. *See, e.g.*, Biggs, 334 F.3d at 914-15; Sass, 461 F.3d at 1128. "California Penal Code section 3041 vests . . . all . . . California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons v. Carey, 505 F.3d 846, 850-51 (9th Cir.), *reh'g denied*, 506 F.3d 951 (9th Cir. 2007).

Respondent argues "AEDPA does not permit relief based on circuit caselaw," citing Crater v. Galaza, 491 F.3d 1119, 1123, 1126 (9th Cir. 2007) (28 U.S.C. § 2254(d)(1) renders decisions by lower courts non-dispositive for habeas appeals) and Earp v. Ornoski, 431 F.3d 1158, 1182 (9th Cir. 2005) ("Circuit court precedent is relevant only to the extent that it clarifies what constitutes clearly established law"). (Ans. 8:5-7.) Respondent contends Ledesma has no federally protected liberty interest in parole. "Respondent acknowledges that in Sass . . . the Ninth Circuit held that California's parole statute creates a federal liberty interest in parole under the mandatory-language analysis of

Greenholtz, but preserves the argument as it is before the Ninth Circuit en banc," citing Hayward, 512

F.3d 536. (Ans. 4:24-5:2.)  The motion to stay this action pending the *en banc* decision in Hayward

was denied. (Dkt No. 10.)  The Sass case and other Ninth Circuit authority are therefore binding on

this Court for purposes of addressing Ledesma's claims.  Sass, 461 F.3d at 1128 (a California prisoner

serving a sentence of a term of years to life with the possibility of parole has a protected liberty interest

in release on parole and consequently a right to due process in parole suitability proceedings).  As

Ledesma's situation parallels that in Sass and Irons, the court concludes he has a constitutionally

protected liberty interest in release on parole.

### b.     **Required Due Process Safeguards**

Where a liberty interest in parole has been created, a prisoner's legitimate expectation cannot

be denied without due process protections.  Greenholtz, 442 U.S. at 11-16; Allen, 482 U.S. at 373-81.

Respondent argues "the only clearly established federal law setting forth the process due in the parole

context is Greenholtz," and "Ledesma does not allege he failed to receive" any procedural protections

in the hearing process, so he "has not shown that the state court decisions denying habeas relief were

contrary to clearly established federal law." (Ans. 8:19-22.) Respondent contends "the Ninth Circuit's

application of the some-evidence standard to parole decisions is improper under AEDPA." (Ans. 8:1-

3.)  However, this Court must apply the "some evidence" standard,  which was clearly established for

purposes of federal habeas review at the time of Ledesma's November 2006 hearing.  Sass, 461 F.3d

at 1129 (for purposes of AEDPA, Hill's "some evidence" standard is "clearly established" federal

law).  Furthermore, under Sass, more than notice, an opportunity to be heard, and an explanation of

the hearing result are required to satisfy due process in the parole context.  Id.

The Supreme Court has held "revocation of good time does not comport with 'the minimum

requirements of due process,' unless the findings of the prison disciplinary board are supported by

some evidence in the record." Hill, 472 U.S. at 454 (citation omitted).  The Ninth Circuit has applied

the Hill "some evidence" standard in the parole context because, like the application of good time

credits, parole suitability determinations directly affect the duration of the prison term.  Jancsek v.

Oregon Board of Parole, 833 F.2d 1389, 1390-91 (9th Cir. 1987); *see* Sass, 461 F.3d at 1128-29;

Biggs, 334 F.3d at 915; McQuillion I, 306 F.3d at 904; *see also* Irons, 505 F.3d at 851 ("[T]he

1   Supreme Court [has] clearly established that a parole board's decision deprives a prisoner of due

2   process with respect to this interest if the board's decision is not supported by 'some evidence in the

3   record' . . . or is 'otherwise arbitrary' "), *quoting* Sass, 461 F.3d at 1128-29, *citing* Hill, 472 U.S. at

4   457, 455-56.  The California Supreme Court has also adopted the Hill standard to review parole

5   decisions.  Rosenkrantz, 29 Cal. 4th 616.  That standard "is minimal, [but] assures that 'the record is

6   not so devoid of evidence that the findings of the . . . board were without support or otherwise

7   arbitrary.'" Sass, 461 F.3d at 1128, 1129, *quoting* Hill, 472 U.S. at 455-56, 457 ("the relevant question

8   is whether there is any evidence in the record that could support the conclusion reached [by the state

9   agency]") (emphasis added).  Satisfaction of the "some evidence" standard is thus a requirement of

10  due process.  *See, e.g.*, Edwards v. Balisok, 520 U.S. 641, 648 (1997).  The evidence relied on "must

11  possess 'some indicia of reliability.'"  Biggs, 334 F.3d at 915, *quoting* Jancsek, 833 F.2d at 1390; *see*

12  *also* Caswell v. Calderon, 363 F.3d 832, 838-39 (9th Cir. 2004).

13       The evidentiary analysis is "framed by the statutes and regulations governing parole suitability

14  determinations in the relevant state."  Irons, 505 F.3d at 851 ("[W]e must look to California law to

15  determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must

16  review the record in order to determine whether the state court decision holding that these findings

17  were supported by 'some evidence' in [the petitioner's] case constituted an unreasonable application

18  of the 'some evidence' principle articulated in Hill, 472 U.S. at 454"); *see* Biggs, 334 F.3d at 915;

19  Sass, 461 F.3d at 1128.  Under California law, the BPH must set a release date unless the conviction

20  offense is so grave public safety concerns require a lengthier period of incarceration.  CAL. PEN. CODE

21  § 3041(b).  "Regardless of the length of time served, a life prisoner shall be found unsuitable for and

22  denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to

23  society if released from prison."  CAL. CODE REGS., tit. 15, § 2281(a).[6]  "While the Board must point

24  to factors beyond the minimum elements of the crime for which the inmate was committed, it need

25  engage in no further comparative analysis before concluding that the particular facts of the offense

---

26

27       [6]  The pertinent parole criteria and guidelines for life prisoners appear at CAL. CODE REGS, tit. 15,
    §§ 2280, *et seq.*  Parole criteria and guidelines for murders committed on or after November 8, 1978 appear
28  at CAL. CODE REGS, tit. 15, §§ 2401, *et seq.*

make it unsafe, at that time, to fix a date for the prisoner's release," **as long as the panel makes an individualized determination in each discrete case in consideration of "the dangerous implications of a life-maximum prisoner's crime individually**." (Pet. Exh. K, pp. 6-7 (emphasis added), *citing* In re Dannenberg, 34 Cal.4th 1061, 1071 (2005).) The BPH "must apply detailed standards when evaluating whether an individual is unsuitable for parole on public safety grounds," but has broad discretion in deciding what weight to give the codified factors bearing on the parole decision. Dannenberg, 34 Cal.4th at 1071,1080, 1096 n.16; *see* Rosenkrantz, 29 Cal.4th at 677. To avoid an arbitrary and capricious result, the panel must consider both circumstances tending to show unsuitability[7] and circumstances tending to show suitability.[8] Moreover, **"it is not enough that there is some evidence to support *the factors* cited for the denial; that evidence must also rationally support *the core determination* required by the statute before parole can be denied, *i.e.*, that a prisoner's release will unreasonably endanger public safety**." In re Roderick, 154 Cal.App.4th 242, 263, 264 (2007) (emphasis added) (the Board, in its decisions, must articulate reasons grounded in evidence *and* rationally related to the statutory basis for denial), *citing* In re Lee, 143 Cal.App.4th 1400, 1409 (2006) ("Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety"); *see also* Sass, 461 F.3d at 1129. The BPH is required to consider all relevant, reliable information bearing on the suitability

---

[7]  Guideline circumstances tending to show **unsuitability** include: (1) the "especially heinous, atrocious, or cruel manner" of the commitment offense, considering such factors as multiple victims "attacked, injured or killed in the same or separate incidents," the offense "was carried out in a dispassionate and calculated manner, such as an execution-style murder," "the victim was abused, defiled or mutilated during or after the offense;" the manner of the offense "demonstrates an exceptionally callous disregard for human suffering," and "the motive for the crime is inexplicable or very trivial in relation to the offense;" (2) the prisoner's previous record of violence, meaning he "on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age;" (3) "unstable or tumultuous" social history in relationships with others; (4) psychological factors, meaning "a lengthy history of severe mental problems related to the offense;" and (5) institutional behavior by engaging in serious misconduct while incarcerated. CAL. CODE REGS., tit. 15, § 2281(c).

[8]  Guideline circumstances tending to show **suitability** include: (1) no juvenile record; (2) stable social history, meaning the "prisoner has experienced reasonably stable relationships with others;" (3) signs of remorse, including such indices as giving "indications that he understands the nature and magnitude of the offense;" (4) motivation for the crime resulted from "significant stress in his life, especially if the stress had built up over a long period of time;" (5) lack of any "significant history of violent crime;" (6) the prisoner's age reduces the probability of recidivism; (7) the "prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release;" and (8) institutional behavior and activities "indicate an enhanced ability to function within the law upon release." CAL. CODE REGS., tit. 15, § 2281(d).

determination.  CAL. CODE REGS., tit. 15, § 2281(b).  As recently summarized by the California Supreme Court:

> The Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety [and] the core determination of "public safety". . . involves an assessment of an inmate's *current* dangerousness. . . . [A] parole release decision authorizes the Board (and the Governor) to identify and weigh **only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts."** These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate.

In re Lawrence, 44 Cal.4th 1181, 205-06 (2008) (citation omitted) (bolded emphasis added).

**B.**     **Parole Unsuitability Conclusion Lacks Evidentiary Support And Is Contradicted By Reliable, Probative Evidence The BPH Improperly Disregarded**

**1.**     **Scope Of Review And Parties' Arguments**

Federal habeas relief may be granted if the state court's adjudication was "based on an unreasonable determination of the facts in light of the evidence presented at the State Court proceeding."  28 U.S.C. § 2254(d)(2).  Respondent argues Ledesma's parole denial may not be disturbed because it was supported by "some evidence" for "Ledesma's documented inability to abide by the law consistently and his brutally violent and random victimization of innocent bystanders during the commitment offenses."  (Ans. 9:8-12.)  Ledesma summarizes his argument:

> The findings set forth by the 2006 panel to support its notion, that Mr. Ledesma is unsuitable for parole because he would pose "an unreasonable risk of danger to society, or a threat to public safety, if released from prison," are supported by no evidence, inapposite to the record and governing parole statutes and regulations, and bear no nexus to his current parole risk, the State's parole determinant.  The interminable preclusion of Mr. Ledesma's parole on this immutable basis, converting his prison term to life without the possibility of parole, denies due process.  [¶]  The risk to public safety posed by Mr. Ledesma's parole, as assessed in his recent forensic psychological evaluations, is *no more than the average citizen*.  No contrary evidence exists, was cited by the 2006 panel, or was cited by the state courts or in the Answer, which have omitted these claims.  Mr. Ledesma's 30-year old commitment offense facts bear no further nexus to his current parole risk especially after he has served [] more than ***double*** the maximum prison term prescribed by the Board's regulations for the facts of his commitment offense and has been forensically evaluated to pose a negligible, if any, risk to public safety.  The panel set forth no evidence to the contrary and the state courts and Answer omit this claim.

(Traverse 15:2-19 (emphasis in original).)

The Superior Court correctly stated the "Board had very broad discretion to identify and weigh the factors relevant to predicting by subjective analysis whether an inmate will be able to live in a society without committing additional antisocial acts." (Pet. Exh. K, 5:15-19, *quoting* Fuentes, 135 Cal.App.4th at 160.) The California statutes and regulations establish "the findings that are necessary to deem a prisoner unsuitable" from the evidence presented in the particular case. Irons, 505 F.3d at 851. Courts "review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' in [Petitioner's] case constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*." Id. The question is whether any evidence bearing "some indicia of reliability" supports the conclusion the inmate should not be paroled because he or she would pose a *current* danger to society. Biggs, 334 F.3d at 915.

###### 2. The State Courts Properly Rejected Three Of The BPH Panel's Six Findings As Unsupported By Evidence

Although the "precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Board of Parole Hearings," "the decision must reflect an individualized consideration of the specific criteria and cannot be arbitrary or capricious." (Pet. Exh. K, pp. 5-6.) Applying that standard, the Superior Court found in Ledesma's case "three of the six findings made by the Board lack adequate evidentiary support," foreclosing their use to justify denial of parole. (Pet. Exh. K, 4:24-25.) Those three were the unsuitability factors of institutional misconduct, unstable social history, and "incomplete" psychological assessment. This Court not only presumes the correctness of those state court determinations, and also finds them to be objectively reasonable. 28 U.S.C. § 2254(e)(1); Woodford, 537 U.S. at 241; Bell, 535 U.S. at 694; Miller-El, 537 U.S. at 340. Ledesma's last disciplinary infraction had occurred more than a decade earlier, and none had involved violence. His exceptional family support and multiple post-release offers of housing, employment, and 12-step program assistance reflect a stable adult social history. Dr. Schroeder's Psychological Report was recent, highly relevant, and consistent with prior evaluations of Ledesma's low public danger risk and the legitimacy of his insights and rehabilitation, yet the BPH chose to disregard its contents, summarily and inexplicably labeling it "incomplete."

1   Nevertheless, the Superior Court found two of the six unsuitability factors adequate to justify

2   the parole denial result: **"The circumstances of the commitment offense and petitioner's criminal**

3   **history alone reasonably justify the Board's lingering concern over petitioner's current**

4   **suitability for release on parole."** (Pet. Exh. K, 4:9-12 (emphasis added).)  The Court concluded,

5   "While three of the six findings made by the Board lack adequate evidentiary support, petitioner's

6   documented inability to abide by the law consistently and his brutally violent and random victimization

7   of innocent bystanders during the commitment offenses support the Board's conclusion that petitioner

8   remains currently unsuitable for release on parole."  (Pet. Exh. K, 4:24-5:3.)  The court cited no

9   authority under which the immutable characteristics of Petitioner's criminal history and commitment

10   offenses, regardless of their egregious nature, satisfied the "some evidence" due process standard,

11   particularly in light of the probative clinical assessments documenting the prisoner's positive evolution

12   in the intervening decades.  Were such evidence sufficient, Petitioner would never be entitled to a

13   release date.

14        **3.     BPH's Conclusion Ledesma Was Unsuitable For Parole Not Supported By**
           **"Some Evidence" Bearing Indicia Of Reliability On Any Stated Ground**

15

16             **a.     "Circumstances Of Commitment Offense" Factor**

        California regulations identify five considerations pertinent to a determination the commitment

17   offense was carried out in "an especially heinous, atrocious or cruel manner" when that factor is used

18   to support a parole unsuitability decision.  Cal. Code Regs, tit. 15, § 2281(c)(1).  Those

19   considerations are:  multiple victims attacked, injured or killed in the same or separate incidents;

20   dispassionate and calculated manner of the offense, "such as an execution-style murder"; abuse,

21   defiling, or mutilation of the victim; "exceptionally" callous disregard for human suffering in the

22   manner of the offense; and inexplicable or very trivial motive in relation to the offense.  Id.

23   § 2281(c)(1)(A)-(E).  The BPH relied on the "victimization of innocent bystanders during the

24   commitment offense," the "callousness" of the murder, and the "trivial motive" as evidentiary support

25   for this unsuitability factor.  The Superior Court upheld that finding: "[T]he circumstances of the

26   commitment offense support the Board's characterization of the same as *especially* vicious and brutal

27   acts carried out with an *exceptionally* callous disregard for human suffering" associated with the

28

1   robberies and shooting.  (*See* Pet. Exh. K, 3:13-15 (emphasis added).)  Coupled with his juvenile

2   criminal record, the court summarily concluded the crimes supported the BPH's ultimate finding:

3   "These factors reflect a level of cruel premeditation and a callous and persistent disregard for the safety

4   and well being of others that cannot be ignored."  (Pet. Exh. K, 4:12-13.)

5         However, the Superior Court, like the BPH, fails to establish any evidentiary link between the

6   30-year-old, static facts of the commitment offenses and Ledesma's juvenile criminal history and the

7   conclusion he *presently* poses an unreasonable risk to public safety.  As cautioned in Lawrence, "few

8   murders do not involve attendant facts that support" a conclusion the commitment offense was carried

9   out in an "especially heinous, atrocious or cruel manner."  Lawrence, 44 Cal.4th at 1224-25, *quoting*

10  Cal. Code Regs § 2281(c)(1).  Examining pertinent California law, the Lawrence court confirmed

11  the due process components of the current dangerousness inquiry "cannot be undertaken simply by

12  examining the circumstances of the crime in isolation, **without consideration of the passage of time**

13  **or the attendant changes in the inmate's psychological or mental attitude.**"[9] Id. at 1221 (emphasis

14  added).  "[T]he aggravated nature of a crime does not in and of itself provide some evidence of *current*

15  dangerousness to the public **unless the record also establishes** that something in the prisoner's pre-

16  or post-incarceration history, or his or her current demeanor and mental state, indicates that the

17  implications regarding the prisoner's dangerousness that derive from his or her commission of the

18  commitment offense **remain probative to the statutory determination of a continuing threat to**

19  **public safety.**"  Id., 44 Cal.4th at 1214 (emphasis added), *citing* Rosenkrantz, 29 Cal.4th 616.

20        This Court defers to the BPH and state court construction of the commitment offenses as

21  involving "multiple victims . . . injured or killed in the same or separate incidents."  However, their

22  characterization of the murder as "carried out in a dispassionate and calculated manner" is not

23  _____

24        [9]  "The relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially
callous, or shockingly vicious or lethal, but whether the identified factors are *probative* to the central issue of

25  *current* dangerousness when considered in light of the full record before the Board."  Lawrence, 44 Cal.4th
at 1221, 1202 (where evidence of the prisoner's rehabilitation and suitability for parole are overwhelming, and

26  the commitment offense is both temporally remote and mitigated by circumstances indicating the conduct is
unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does

27  not provide "some evidence"); *see* In re Shaputis, 44 Cal.4th 1241, 1254-55 (2008), *reh'g den.* (Oct. 22, 2008)
(in determining whether an inmate poses a current danger, "the relevant inquiry is whether the circumstances

28  of the commitment offense, when considered in light of other facts in the record, are such that *they continue
to be predictive* of current dangerousness many years after commission of the offense") (emphasis added).

supported by any evidence.  All accounts describe the shooting as an angry and impulsive response to Ledesma's frustration at being denied access to the safe.  This crime was not a dispassionate "execution-style" event.  While the robbery may have been premeditated, planned, and calculated, the record provides no indication the murder was carried out in the same way.  Neither the BPH nor the Superior Court elaborates how an impulsive, drug-influenced shooting during a robbery supports a finding of "exceptional" brutality or viciousness.[10]  Furthermore, the Court finds the BPH and state court characterizations of the offenses as manifesting "exceptionally" callous disregard for human suffering is an objectively unreasonable determination of the facts.[11]  Ledesma displayed no unusual viciousness or cruelty inflicted for the purpose of prolonging human suffering adequate to support the determination he is presently unsuitable for parole.  Substantial evidence from the intervening 30 years documents remission of his drug addictions, a complete absence of violence during incarceration, successful therapy for anger management, and significant educational and vocational rehabilitation.  The Court finds no evidence supports the BPH's reliance on the remote circumstances of the commitment offenses as predictive or probative of Ledesma's current dangerousness to society.

Similarly, the Court finds the BPH and state court construction of "the motive for the crime [as] inexplicable or very trivial in relation to the offense" is unsupported by the record.  Because any motive for robbery would seem trivial compared to its potentially deadly consequences, individualized

---

[10]  Reference to the shooting as "execution style" at the hearing echoes the statutory example of a circumstance that can be considered to support a parole unsuitability finding based on commitment of the crime in an "especially heinous or callous manner."  CAL. CODE REGS, tit. 15, § 2402(c)(1)(A)-(E).  However, it is far from clear that a "point blank range" shooting is co-extensive with an "execution-style" murder.  Ledesma impulsively shot the clerk once in the stomach before running out the door.  No description of record suggests he manifested an intent to actually dispatch the victim.  On the contrary, a witness statement in the investigation report describes Ledesma aiming the shotgun at the victim's head while demanding cash register money, but the actual shot was to the body.

[11]  Cf. Dannenberg, 34 Cal.4th at 1069-70 (petitioner, serving a 15-years to life sentence for the second degree murder of his wife, had beat her with a pipe wrench during a domestic argument, then drowned her in a bathtub properly denied parole based on "some evidence" the viciousness of the commitment offense rendered him unsuitable for parole for reasons of public safety); Irons, 505 F.3d at 849, 852-53 (petitioner, serving a 17-years to life sentence for second degree murder of a co-tenant of rental house, had argued with the victim over suspicions he was dealing drugs and stealing from petitioner and their landlord, went to his room, retrieved his gun, returned to the victim's room, shot him 12 times, stabbed him twice in the back when he complained of pain, then wrapped the body in a sleeping bag, leaving it in the room for ten days while petitioner procured a car, then took the body to the coast, weighed it down, and disposed of it in the ocean, properly denied parole at his suitability hearing because "some evidence" supported the panel's decision and the state court thus did not unreasonably apply the Hill principle).

08cv0309-JTM(CAB)

1  review by the BPH is particularly important.  Furthermore, in Ledesma's case the motive was not

2  "inexplicable."  On the contrary, the panel itself noted Ledesma effected the robbery to steal money

3  to support his drug habit.  Accordingly, no evidence supports a finding the crimes were "inexplicable."

4          Although remorse is a codified suitability factor, the Superior Court did not list lack of remorse

5  as a discrete finding, nor did it revisit that component of the BPH's decision. CAL. CODE REGS., tit.

6  15, § 2281(d).  The hearing transcript reveals the panel perceived a lack of remorse which influenced

7  its final decision.  The Presiding Commissioner chided Ledesma for addressing only concerns for

8  himself and his family:  "I really didn't hear anything regarding the family of the victim, Mr. Mason,

9  or himself."  (Pet. Exh. A, p. 93.)  The Court finds the BPH misstated the record; on several occasions

10  during the hearing, Ledesma expressed remorse for the murder and specifically for the consequences

11  for the victim's family.  The sincerity of his remorse for the life he took was substantiated by Dr.

12  Schroeder's opinion he would experience lifelong "self-recrimination" and Ledesma's own comment

13  that he deserved to remain in prison. (Pet. Exh. A, pp. 39, 87.)  As the Superior Court found, there was

14  no evidentiary support for the panel's rejection of Dr. Schroeder's Psychological Report as

15  "incomplete."  Had the panel considered that highly relevant evidence, it would have had to justify its

16  rejection of the report's substantive contents on the remorse issue.  Taylor, 366 F.3d at 1007-08.

17          While some evidence supports the BPH's concern on the commitment offense factor, that

18  evidence does not adequately support the BPH's ultimate unsuitability determination.  The Superior

19  Court merely recited:  "While the Board must point to factors beyond the minimum elements of the

20  crime for which the inmate was committed, it need engage in no further comparative analysis before

21  concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the

22  prisoner's release."  (Pet. Exh. K, 6:26-7:2, *quoting* Dannenberg, 34 Cal.4th at 1071.)  Neither the

23  BPH nor the Superior Court made objectively reasonable factual findings linking "some evidence" of

24  the commitment offense *factor* to "some evidence" of parole unsuitability on grounds of present public

25  danger.

26                          **b.     "Criminal History" Factor**

27          The second negative factor cited by the BPH, and upheld by the Superior Court, was a "history

28  of prior criminality" based on Ledesma's undisputed juvenile criminal record.  (Pet. Exh. K, 3:15-18,

1   *citing* CAL. PEN. CODE § 3041(b), CAL. CODE OF REGS., tit. 15, § 2281(b), (c)(1), (c)(2).)  The Superior

2   Court found that factor, coupled with the offense circumstances, supported the BPH's finding he

3   demonstrated an "inability to abide by the law consistently."  (Pet. Exh. K, 4:14-23.)

4          The Superior Court rejected Ledesma's contention the BPH "impermissibly continues to rely

5   on the unchanging circumstances of his commitment offense and criminal history to deny him parole

6   in violation of his right to due process."  (Pet. Exh. K, 6:12-14.)   The court found the BPH's reliance

7   on the "dangerous implications of a life-maximum prisoner's crime individually" (Pet. Exh. K, 6:24-

8   27), along with Ledesma's criminal history, satisfied due process because evidence supported each of

9   those factors.   However, as stated above, evidence of one or more unsuitability *factors* does not

10  necessarily demonstrate present dangerousness.  <u>Lawrence</u>, 44 Cal.4th at 1214, 1221.  The court did

11  not analyze whether Ledesma's panel had identified an evidentiary link between his long-past juvenile

12  criminal conduct and its conclusion he would pose a *present* public danger if released.  This Court

13  finds use of Ledesma's criminal history as the "some evidence" purportedly predictive of a public

14  safety risk were he released thirty years afterward was objectively unreasonable, particularly since

15  Petitioner has recovered from the drug additions he faced at the time and has engaged in extensive

16  educational, vocational, psychological, and self-help programming during the intervening years.

17                    **c.    Arbitrary Exclusion Of Relevant Psychological Evidence Coupled**
                              **With Weight Given DA's Argument Resulted In Unreasonable**
18                            **Factual Determination Of Parole Unsuitability**

19          A final consideration cited by the BPH, the DA's opposition to parole release, is not a codified

20  "factor" to be weighed by the panel assessing suitability, albeit a fact the panel must consider.  The

21  Superior Court listed that finding as one of the six it was reviewing, reciting in a footnote:

22                    In light of this determination [that evidence supported the panel's
                      findings the crime was brutally violent and Ledesma had prior criminal
23                    history], **there is also no abuse of discretion in the Board's decision**
                      ***to rely on*** **the Orange County District Attorney's opposition to**
24                    **petitioner's release on parole** ***as a basis for*** **its determination**.  The
                      Board is statutorily required *to consider* the views of the People's
25                    representative when evaluating the parole suitability of a particular
                      inmate.  (See, Pen. Code § 3041.1; § 3046(c).
26
    (Pet. Exh. K, p. 4, n.1 (emphasis added).))
27
            Both the BPH and the court appear to have uncritically accorded the DA's personal opinions
28

*evidentiary* weight ("rely on" as a "basis for") in denying Ledesma parole for the nineteenth time. (Pet. Exh. K, p. 4, n.1.)  His opinions carry no indicia of reliability predictive of the inmate's post-parole conduct.  The DA presented nothing new nor did he marshal any evidence bearing on Ledesma's *current* mental or emotional suitability for parole.  The DA merely offered argument and personal opinion as to how the commissioners should construe the facts of the commitment offense and Ledesma's juvenile criminal history, and concluded those factors were emblematic of immutable callousness.  The DA was dismissive of Ledesma's lengthy 12-step program participation, substituting his own analysis for the professional opinions of the mental health professionals.

The BPH's unjustified rejection of Dr. Schroeder's Psychological Report removed from the equation the most reliable evidence bearing on the parole suitability determination.  The decision to disregard her report was arbitrary, as the Superior Court implicitly recognized when it found no evidentiary support for the panel's characterization of the report as "incomplete." (Pet. Exh. A, p. 92.) Consequently, the panel's determination it needed a "complete" psychological assessment before it could find Ledesma suitable for safe reentry into society also lacked evidentiary support.  The panel abrogated its responsibility to consider "[a]ll relevant and reliable information" of record. CAL. CODE REGS., tit. 15, § 2402(b).

Ledesma represented without contradiction Dr. Schroeder's report was several pages long and was intended to supplement several prior psychological reports also reaching conclusions favorable to a parole suitability determination.  He himself had requested a continuance of his 2005 hearing for the express purpose of obtaining that report. (Pet. Exh. A, p. 28.)  From the undisputed descriptions on the record, the report contained clinical findings Ledesma had acquired an understanding of the magnitude and senselessness of his crime, he would experience lifelong self-recrimination for the murder, and he had come to grips through maturation and institutional programming with causative factors that led to his criminal conduct, in particular his substance abuse (found by the psychologist to be in "complete remission"), his previously poor anger management, poor coping skills, and his aimlessness. Dr. Schroeder's conclusions regarding his mental and emotional preparedness for release were consistent with prior assessments: an August 2003 psychological report by another BPH forensic expert, Dr. Joe D. Livingston, Ph.D., concluding Ledesma would be "a low to moderate risk for future

violence in the free community;" an August 1999 psychological evaluation by Dr. Erich Rueschenberg, Ph.D., concluding Ledesma's "risk for future violence, which previously had been estimated to be within the moderate range, now appears to be within the below average range;" and an October 2002 psychological evaluation by Dr. Rueschenberg concluding "[o]verall, the available information reflects that [Petitioner] falls into a category that represents <u>low</u> to moderate risk for future violence in the community." (Pet. pp. 4-5, quoting Exhibit C, pp. 6, 11, 16.)

Although the Superior Court reasonably found no evidence supported the BPH's decision to summarily disregard Dr. Schroeder's probative report, it unreasonably failed to reconcile that evidence with its own conclusion the BPH accorded Ledesma due process. <u>Taylor</u>, 366 F.3d at 1007-08 ("In making findings, a judge must acknowledge significant portions of the record, particularly where they are inconsistent with the judge's findings"). The BPH excluded probative *evidence* contrary to the panel's *impression* Ledesma was insufficiently remorseful for the crime, apparently in favor of the DA's *opinions* Dr. Schroeder was merely "channeling" some contrived linguistic performance by Ledesma.

For all the foregoing reasons, the Court finds the BPH and the Superior Court failed to satisfy even the minimally stringent due process requirements of evidentiary support for a determination of parole unsuitability elaborated in <u>Biggs</u>, 334 F.3d 910, <u>Sass</u>, 461 F.3d 1123, and <u>Irons</u>, 505 F.3d 846. While both correctly stated the ultimate question was whether the inmate would pose a *current* public danger if released, their analyses demonstrate only evidentiary support for the existence of two discrete unsuitability factors. *See* <u>Lawrence</u>, 44 Cal.4th at 1212; <u>Rosenkrantz</u>, 29 Cal.4th at 658; <u>Dannenberg</u>, 34 Cal.4th at 1071. Neither "explained and reconciled" how inconsistent parts of the record could still support the result. *See* <u>Taylor</u>, 366 F.3d at 1007-08. No evidence, dating back at least a dozen years, links the Board's finding of unsuitability in November 2006 to the 1976 circumstances of the commitment crimes and Ledesma's prior juvenile criminal history. He had sustained no disciplinary infractions in that period, had participated actively in AA and NA programs, was about to complete his Bachelor's degree, had trained and worked at several trades, had realistic plans for self-sufficiency upon release with a large family and network of their friends offering practical and moral support, had conscientiously followed the BPH advice from prior hearings, and had shown no violent tendencies

while incarcerated.  On the other hand, substantial evidence supported a finding of parole suitability: remorse and understanding of the nature and magnitude of his offenses; the crimes were committed during a time of significant stress from social circumstances and drug addictions; realistic plans for release using marketable skills developed while incarcerated; and institutional education and programming activities indicating an enhanced ability to function within the law.  *See* CAL. CODE REGS, tit. 15, § 2281(d).

Under 28 U.S.C. § 2254(d)(2), a reviewing federal court may find the state court has made an unreasonable determination of the facts when it failed to consider and weigh highly probative evidence central to the petitioner's claim.  Taylor, 366 F.3d at 1005.  This Court finds the exclusively historical perspective adopted by the BPH and the state courts fails to satisfy the due process requirement that "some evidence" support the conclusion the inmate will be currently unable to live in society without committing additional antisocial acts.  Neither the BPH nor the Superior Court identified *any* contemporary evidentiary link between Ledesma as the angry, drug-addicted teenage dropout of 30 years ago and his presentation at the 2006 hearing.  There was, accordingly, an insufficient basis for due process purposes to deny Ledesma parole at that time.

## C.     Choice Of State Sentencing Guideline Raises No Cognizable Federal Habeas Issue

Ledesma adamantly argues parole determinations under the DSL are far more onerous for the inmate than under the ISL "in effect at the time of his offense," placing him at "an enormous statutory and statistical disadvantage," and implicating due process and *ex post facto* considerations.  (Traverse pp. 13-14, referring to Petition pp. 41-52.)  The Superior Court disposed of this issue, in pertinent part, with the finding: "Standards employed under the former indeterminate sentencing law for determining parole were not altered by the enactment of the determinate sentencing law."  (Pet. Exh. K, p. 7.) Federal reviewing courts may not revisit state law determinations on state law issues.  Estelle, 502 U.S. at 68.  Moreover, as the Court has found Ledesma is entitled to habeas relief because his federal constitutional rights were violated on other grounds, it need not revisit the state court's resolution of any federal component of this claim.

## D.     Remedy

Ledesma "seeks an order reversing the decision of the November 2, 2006, BPH panel, and

1   because the maximum prison term in accordance with the regulations commensurate with the facts of

2   his offense and his prescribed three-year parole term (Pen. Code § 3000 et. seq.) have lapsed, directing

3   his release from prison and the discharge of his prison and parole terms." (Pet. 54:8-13.)  Respondent

4   contends Ledesma is not entitled to be released or discharged from state custody, should the Court

5   grant the Petition, because his "remedy is limited to the process that is due, which is a new review by

6   the Board comporting with due process."  (Answer 5:17-19.)  Respondent cites Benny v. U.S. Parole

7   Comm'n, 295 F.3d 977, 984-85 (9th Cir. 2002) for the proposition a due process error does not entitle

8   an inmate to a favorable parole decision.  (Answer 5:19-22.)  However, the Benny case involved delay

9   in holding a revocation hearing for a federal parolee rather than an evidentiary challenge to denial of

10  parole under California law.  Ordering the BPH to re-assess the petitioner's current dangerousness

11  based on the same evidence this federal habeas court has deemed insufficient to sustain the

12  unsuitability finding would be a futile endeavor.

13        Federal habeas courts have discretion "to control and direct the form of judgment to be entered

14  in cases brought up before it on habeas corpus," and may "fashion the remedy as law and justice

15  require. . . ." Burnett v. Lampert, 432 F.3d 996, 999 (9th Cir. 2005) (citation omitted).  When the

16  evidence does not support the BPH's determination the petitioner was not suitable for parole,

17  immediate release can be a proper remedy.  McQuillion v. Duncan ("McQuillion II"), 342 F.3d 1012,

18  1015-16 (9th Cir. 2003) (affirming order of immediate release without imposing parole conditions,

19  reasoning that if the petitioner had been released at the appropriate time, his three-year parole period

20  would have long since expired).  Consistent with McQuillion II, even if a putative parole period has

21  not expired, a proper remedy may affect the parole terms.  Here, if Ledesma had been granted a parole

22  date following his November 2006 suitability hearing, a three-year parole term would expire in late

23  2009 or early 2010.  In calculating Ledesma's parole term, then, the BPH must credit him with time

24  served beyond the parole date he would have received under California law had he not been denied

25  parole in 2006.  See Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1087 (C.D.Cal. 2006); Martin v.

26  Marshall, 448 F.Supp.2d 1143, 1145 (N.D.Cal. 2006).

27  **III.    CONCLUSION AND ORDER**

28        For the reasons set forth above, the Court finds the BPH's November 2, 2006 conclusion that

1    Ledesma was unsuitable for parole, and the state courts' decision to uphold the unsuitability

2    determination, violated Ledesma's due process rights.  His petition for a writ of habeas corpus is

3    therefore **GRANTED.** Judgment shall be entered in Petitioner's favor.  **IT IS HEREBY ORDERED**

4    if Ledesma remains incarcerated at this time, Respondent shall, within ten (10) days of entry of this

5    order, release Ledesma from custody.  **IT IS FURTHER ORDERED**, in determining Ledesma's

6    parole period, the BPH shall credit him with custodial time served since the release date he would have

7    received on a 2006 finding of suitability, or the date when such a finding would have become final

8    pursuant to CAL. PEN. CODE § 3041(b) and 3041.2(a), whichever is later.

9           **IT IS SO ORDERED**.

10   DATED:  August 3, 2009

11                                                          _____

12                                                          Hon. Jeffrey T. Miller
                                                            United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28